UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

UNITED STATES OF AMERICA,

      Plaintiff,　　　　　　　　　　　Case No. 1:23-cr-095

v.　　　　　　　　　　　　　　　　　　Hon. Robert J. Jonker
　　　　　　　　　　　　　　　　　　　　United States District Judge
RASHAD MALEEK TRICE,

      Defendant.

_____/

## DEFENDANT'S SENTENCING MEMORANDUM

### Introduction

The defendant, Rashad Maleek Trice, is scheduled for sentencing before Your Honor on August 23, 2024.  Mr. Trice entered a guilty plea pursuant to a Plea Agreement (ECF No. 55, PageID.411-420) to Count 1 of the Indictment charging him with Kidnapping Resulting in Death, contrary to 18 U.S.C. § 1201(a)(1).

The final Presentence Investigation Report (PSR) scores Mr. Trice as total offense level 43 and a criminal history category V.  (ECF No. 64, PSR, PageID.587-613).  Mr. Trice's applicable guideline range is a mandatory life sentence.  There are no outstanding objections to the PSR.

Mr. Trice respectfully submits this Sentencing Memorandum to assist the Court in sentencing Mr. Trice.

## Legal Discussion

Overall, as the Court is aware, the principle and basic mandate of 18 U.S.C. § 3553(a) requires this Honorable Court to impose a sentence "sufficient, but not greater than necessary" to comply with the four (4) purposes set forth in § 3553(a)(2):

> **§ 3553. Imposition of a sentence.**
>
> **(a) Factors to be considered in imposing a sentence.** – The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider –
>
> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; and
>>
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. . .

18 U.S.C. § 3553(a)(2).

In *United States v. Ferguson*, 456 F.3d 660, 665 (6th Cir. 2006), the Court held that after *United States v. Booker*, 543 U.S. 220 (2005), a judge must impose the lowest sentence that is "minimally sufficient" to meet those goals regardless of whether that sentence is probation, time served, a mandatory minimum sentence, the statutory maximum, or somewhere in between.

## 18 U.S.C. § 3553(a) Factors

1. **(a) Nature and Circumstances of the Offense**
   **(b) History and Characteristics of the Defendant**

Rashad Maleek Trice is 27 years old. He was born and raised in Detroit, Michigan. At the time Mr. Trice was born, his parents were not married. By the time Mr. Trice was 8 years old, his father was convicted of a homicide and was sent to prison. His father remained in prison until he was released in 2017 after serving approximately 17 years. During those formative years, Mr. Trice did not have a relationship with his father. Mr. Trice still does not have a relationship with his father and he has spoken about the fact that once his father got out of prison, he quickly established a relationship with another woman and had a child. Mr. Trice spoke about how that fact negatively affected him since it was clear his father placed that relationship over establishing a relationship with Mr. Trice once his father finally got out of prison.

Mr. Trice had a much stronger relationship with his mother. His mother raised him until she also had some issues with the criminal justice system and was sent to prison when Mr. Trice was 10 years old. She was charged with a felony firearm possession and served 720 days imprisonment. When Mr. Trice's mother went to prison, he was not told what had happened. The effect of his parents both going to prison and eventually Mr. Trice finding out what really happened with his mother left him with a fear of abandonment and anxiety. As a result, Mr. Trice developed an anxious attachment style. (Attachment A, Mitigation Report). He was sent to live with his uncle, John Horsley, who lived in California. Mr. Horsley had a strong influence on Mr. Trice and he served in the United States military. Because Mr. Trice

3

was not told what happened to his mother when he would miss her and call to speak with her, he would be told she was unavailable or that he had just missed her.

Mr. Trice has one sister with whom he is close, and he has two half-brothers with whom he does not have relationships. Although Mr. Trice is close with his sister, they only have infrequent contact.

Mr. Trice has never been married. His first serious relationship was with the victim, Symari Cole, and the mother of W.C. Mr. Trice and Ms. Cole have a child in common, X.T. During the time that Mr. Trice and Ms. Cole were together, Mr. Trice supported the family. Mr. Trice was employed, paid for housing and the necessities. Since the instant offense Mr. Trice has lost his parental rights of X.T. Losing his son and knowing his son will suffer from the impact of the instant offense has been overwhelming emotionally for Mr. Trice and he indicated he tries not to think about it. Prior to the instant offense, Mr. Trice tried to provide support and love to his son.

Mr. Trice graduated from high school in 2015 from the Frederick Douglas Academy in Detroit, Michigan. He also attended Henry Ford Community College for a year which is also located in Detroit. Although he graduated from high school, it is apparent from receiving his educational records that he had significant academic struggles. As early as the first grade, he failed reading, spelling, and math, and received D's in social studies and science. This pattern continued in grade school. Mr. Trice attended school for the 6th and 7th grades while living with his uncle in California. Mr. Trice recalls he attended special education classes during that time.

In high school Mr. Trice tried to apply himself and do well, and did show some improvement in his grades. Under the guidance of his uncle, throughout high school he

participated in the Reserve Officers' Training Corps (ROTC) program. While attending school he also participated in some extracurricular activities; he was a member of the track team, the Go Green Club (program to minimize the school's carbon footprint), ROTC, and the mascot for his school basketball team. Mr. Trice completing high school was a real accomplishment for him considering all the facts and circumstances.

After the instant offense, Mr. Trice had a psychiatric evaluation completed by Dr. Daniel Post from Pine Rest. Regarding Mr. Trice, Dr. Post concluded Mr. Trice has borderline intellectual functioning. Dr. Post concluded:

> Current intellectual testing and available records support the presence of intellectual difficulty that is likely best characterized as borderline intellectual functioning. He presents with a fourth grade reading level and no history of reported reading intervention or academic support. He does not have a history of a specific learning disability diagnosis but has limited reading ability and likely struggles with reading comprehension. The DSM-5 posits intellectual disabilities on the level of adaptive functioning rather than a precise IQ number. That said, intellectual functioning is one helpful gauge of his ability to think and act in a variety of settings. With a measured full scale intelligence quotient in the extremely low range (FSIQ=66) with reportedly adequate adaptive functioning, one would understand academic challenges and more broadly difficulties with complex thought and decisions.

(ECF No. 63-6, Defendant's Response to PSR, PageID.571-572).

Mr. Trice was also evaluated regarding whether he is competent to stand trial, as well as to assess any undiagnosed psychiatric issues Mr. Trice may have had at the time. Mr. Trice was assessed by Williams J. Sanders DO, MS.

Dr. Sanders' testing and evaluation concluded as follows:

> Rashad Trice is a 27-year-old African American male who was raised in the Detroit, Michigan area. He struggled academically for most of his academic career. He is reported to have been a happy and fun child despite the financial and parental challenges he faced as a child. His father was sent to prison for many years for a murder conviction when he was approximately 8 years of age. His mother was subsequently charged with attempted murder when he was 10 years of age and sent

to prison for a couple of years. While his father and mother were in prison, he was sent to California to live with his uncle Jay. He reported not knowing his mother was in prison when he was sent away, and he was unable to communicate with her for the entire 2 years he was in California. His separation from his parents created difficulty developing trusting and stable relationships throughout his life.

While growing up, there is no evidence that he received appropriate evaluation, testing, or support for an obvious intellectual disability and possible reading disorder. It was clear within the first couple of minutes of his evaluation that he has some cognitive deficits. His documented school grades and recent psychological testing support a diagnosis of a mild intellectual disability (formerly referred to as mild mental retardation). This diagnosis and cognitive level are often understood as individuals that are educable, can learn to care for oneself, employable in routinized jobs but require supervision. Individuals with this diagnosis might live alone but do their best in supervised settings. They are often immature but with adequate social adjustment and usually have no obvious physical anomalies. Moderate and mild retardation, contrary to the more severe forms, are typically not caused by brain damage but are part of the normal variance of intelligence, and therefore largely genetic and inherited. Individuals with IQ values within 51 and 70 **will** graduate special school with enough time, effort and help of others. They are capable of serving themselves and following simple daily duties.

There is suspicion that because of his social, pleasant, and funny demeanor he kept getting advanced in school without the necessary support to achieve appropriate academic milestones before advancing to higher grades. It appears unrealistic given his presentation in this evaluation and related to his psychological testing that he achieved the documented A's and B's in some of his higher level high school classes as indicated on his school records. Rashad presents himself as a possibly socially awkward individual that misunderstands social quos. A clear representation of this is how he became the team Mascot for his high school basketball team. It appears that his school found ways to keep him involved meaningfully despite his cognitive limitations because of his good natured, jovial, and positive attitude.

As Rashad drifted away from his stable, supportive, structured, and familiar living environment going to high school with community support and then working regularly while living close to his family, friends, and community he began to struggle interpersonally and legally. As Rashad's life grew more complex with an intimate relationship, longer commute to work, incurring financial stress with an apartment, participation in childcare, -and experiencing time incarcerated this began to overwhelm him cognitively and emotionally. He has a limited ability to understand more complex relationships and tasks. Furthermore, he has difficulty trusting others in relationships because of his experience of abandonment by his parents while he was growing up. He

6

> experiences the world as a distrustful and chaotic place when not in a stable, structured, familiar place with supports. Further, he described developing some irrational paranoid ideas about his girlfriend, the police, and the world around him while he was experiencing the intense situation on July 2, 2023. Rashad, who is reported to have been a fun loving, goofy, socially awkward kid ended up in several complex emotional and cognitively challenging situations as a young adult that became overwhelming for him and lead to disastrous consequences.

(ECF No. 63-6, Defendant's Response to PSR, PageID.584-586).

Although as noted above Mr. Trice struggled academically and emotionally, he was steadily employed since 2017. He was employed at Uncle Ray's Potato Chips located in Detroit for approximately six years. His employment ended when he became incarcerated. Following his employment at Uncle Ray's, Mr. Trice had employment in 2023 as a general laborer through Fast Temp Services in Lansing, Michigan. That employment ended when Mr. Trice was arrested on the instant offense.

   2.    **The Need for the Sentence Imposed:**

   **(A) To Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense;**
   **(B) To Deter the Defendant and Others from Committing Like Conduct;**
   **(C) To Protect the Public; and**
   **(D) To Provide the Defendant with Needed Rehabilitative Treatment in an Effective Manner**

Mr. Trice has accepted responsibility and understands he must face the consequences of his actions. Mr. Trice knows he faces a mandatory minimum of life in prison.

   3.    **The Kinds of Sentences Available**

Probation is unavailable for Mr. Trice. Mr. Trice faces a sentence with a mandatory minimum of life imprisonment. Mr. Trice respectfully requests mental health treatment while serving his time.

4.  **The Advisory Guideline Range as Expressing the Sense of the Legislature**

The recommended guideline range is a mandatory minimum of life imprisonment.

5.  **Any Other Policy Statement**

No other policy statement appears to be implicated here.

6.  **Unwarranted Disparities**

No unwarranted disparities appear to be implicated here.

## Conclusion

Mr. Trice respectfully requests this Honorable Court sentence him sufficiently, but not greater than necessary, to achieve the goals of sentencing.

Respectfully submitted,

SHARON A. TUREK
Federal Public Defender

Dated:  August 14, 2024

/s/ Helen C. Nieuwenhuis
HELEN C. NIEUWENHUIS
First Assistant Federal Public Defender

/s/ Sharon A. Turek
SHARON A. TUREK
Federal Public Defender
50 Louis, NW, Suite 300
Grand Rapids, Michigan  49503
(616) 742-7420